IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

**Civil Action No. 04-cv-01171-ZLW-MJW**

DAVID CROSBY,

Petitioner,

v.

GARY WATKINS, et al.,

Respondents.

---

## RECOMMENDATION ON APPLICATION FOR A WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254 BY A PERSON IN STATE CUSTODY

---

**MICHAEL J. WATANABE**
**United States Magistrate Judge**

This case is before this court pursuant to a Special Order of Reference to United States Magistrate Judge issued by Senior Judge Zita L. Weinshienk.  (Docket No. 6).

Before the court is the pro se incarcerated petitioner's Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 by a Person in State Custody (Docket No. 2), as amended (Docket Nos. 9 and 11), and petitioner's Memorandum of Law in Support (Docket No. 3).  The respondents timely filed an Answer (Docket No. 12), and the petitioner filed a Traverse.  (Docket No. 13).  Upon order of this court (Docket No. 25), the Clerk of the District Court of Eagle County, Colorado, provided to this court the original written record (Docket No. 26) of Eagle County Case No. 93CR119, People v David Crosby, which this court has reviewed.  The court now being fully informed makes the following findings of fact, conclusions of law, and recommendation

2

that the Application be denied and dismissed.

In his Application, the petitioner challenges a judgment of conviction entered in the District Court of Eagle County upon a jury verdict finding him guilty of two counts of first degree sexual assault, one misdemeanor count of prohibited use of a weapon, and one misdemeanor count of false imprisonment.  Petitioner was sentenced to concurrent 32-year prison terms on each sexual assault count and to one-year terms on the weapon and false imprisonment counts that were to be concurrent with each other but consecutive to the 32-year sentence.  The Colorado Court of Appeals ("CCA") affirmed the judgment of conviction but vacated his sentence and remanded for resentencing.  People v. Crosby, Colo. App. No. 94CA1939, Sept. 5, 1996).  The Colorado Supreme Court denied certiorari on May 19, 1997.  (See Pet. Attach. 2).

On September 18, 1997, the petitioner filed a motion for sentence reconsideration, and on January 28, 1998, the trial court reduced the petitioner's sexual assault sentences to 30 years and changed the misdemeanor sentences to run concurrently with the sexual assault sentences.  (Resp. App. A).

Through counsel, on May 15, 1998, petitioner filed a motion in state court for post-conviction relief.  (Resp. App. I).  That motion was amended in January 1999 and went to hearing on July 19, 1999.  (Resp. App. I).  Following the hearing, in a written order, the trial court denied the petitioner's motion.  (Pet. Attach. 3).  Petitioner moved to reconsider, asserting that the court did not address certain issues, and the court issued another order rejecting those claims.  (Resp. App. B).  The CCA affirmed the trial court's order on December 4, 2003 (Pet. Attach. 4), and the Colorado Supreme

3

Court denied certiorari on May 3, 2004 (Pet. Attach. 5).

Petitioner raises the following three claims for habeas corpus relief:  (1) the trial court erred in refusing to grant petitioner's motion to suppress his statement to the police; (2) the trial court erred in failing to grant his motion to dismiss or for a mistrial because of the destruction by police of the taped statements of the petitioner and the victim; and (3) the appellate court erred in ruling that petitioner had failed to properly raise the issue of deficient counsel for failing to obtain expert medical testimony.

Respondents assert (1) that the petitioner failed to exhaust claim three, which is procedurally defaulted; (2) the trial court properly denied the petitioners' motion to suppress his confession; and (3) the erasure of the audio tape recording of police interviews with the petitioner and the victim did not violate the petitioner's right to due process.

The CCA summarized this case as follows:

> On the night of the incident at issue, the victim went to an apartment in Avon, Colorado, which she had previously shared with the defendant.  There, according to the victim, defendant threatened her with a handgun and forced her to submit to anal and vaginal intercourse. During the assault, the handgun discharged, the bullet striking a wall.

> After the assault, the victim diverted defendant's attention, fled from the apartment, and sought help from a man in a common area of the building.  The man called the police.  The subsequent events were found by the trial court to be as follows:

> Two uniformed officers arrived at 10:52 p.m. and found defendant in the common area of the building.  Although it was a cold November evening, defendant was barefoot and was wearing only a pair of pants. He displayed indicia of alcohol intoxication.

> After telling one of the officers his version of events, defendant

4

asked the officer to help him re-enter his apartment in order to obtain clothing, but, because he did not have his keys, he was unable to gain entry.  Defendant then agreed to accompany the officer to the police station, where defendant would be provided with warmth and shelter.

The two men arrived at the police station at 11:00 p.m. and went to a patrol room.  The door to the room was left open.  It was very cold outside and defendant was still without shoes or a shirt.  Defendant then made more statements to the officer about the victim.  The officer did not then know the specific allegations which the victim had made to the other police officer.

Defendant and the officer continued to talk.  Defendant was cooperative and was "trying to get his story out."  The officer asked defendant for permission to search the apartment, but defendant did not consent and said he thought he ought to consult an attorney.  The officer then departed from the police station at 12:30 a.m., leaving defendant with the principal investigating officer (who was present in the patrol room during part of the time defendant was there but stayed "largely in the background" until the other officer left).

Although the investigating officer believed that defendant was coherent, he thought defendant was too intoxicated to be allowed to leave the station.  Also, the investigating officer, having heard the victim's allegations, believed he had probable cause to arrest defendant.

At 12:37 a.m., the investigating officer informed defendant that he was a suspect in a sexual assault investigation and provided him with a Miranda advisement.  Defendant then agreed to speak with the investigating officer without an attorney.  At the conclusion of the interview, defendant was arrested.

People v. Crosby, 94CA1939 (Colo. App. Sept. 5, 1996); State Court Record Vol. 2 at

334-36.

**PROCEDURAL DEFAULT**

Respondents assert that the petitioner has failed to exhaust his third claim and

that such claim is procedurally defaulted.   Section 2254 of Title 28, U.S.C., as

amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),

5

provides as follows with regard to exhaustion of state court remedies:

. . .

(b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that –

(A) the applicant has exhausted the remedies available in the courts of the State; or

(B)(i) there is an absence of available State corrective process; or

(ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

(2) An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

(3) A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.

(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented. . . .

28 U.S.C. § 2254(b), (c).  "Under the doctrine of exhaustion, a state prisoner must

generally exhaust available state court remedies before filing a habeas corpus action in

federal court. . . .  The exhaustion doctrine requires a state prisoner to 'fairly present[]'

his . . . claims to the state courts before a federal court will examine them."  Demarest

v. Price, 130 F.3d 922, 932 (10th Cir. 1997) (pre-AEDPA).  See Smallwood v. Gibson,

191 F.3d 1257, 1267 (10th Cir. 1999), cert. denied, 531 U.S. 833 (2000).  Furthermore,

"[o]n habeas review, [the] court will not consider issues that have been defaulted in

state court on an independent and adequate state procedural ground, unless the

6

petitioner can demonstrate cause and prejudice or a fundamental miscarriage of

justice." Hickman v. Spears, 160 F.3d 1269, 1271 (10th Cir. 1998).

In this case, respondents correctly assert that the petitioner failed to raise his

third claim in state court in a procedurally proper manner.  As noted by the

respondents, the CCA stated in its December 4, 2003, ruling:

> Defendant contends that his trial counsel rendered ineffective
> assistance by failing to introduce expert testimony on the victim's
> condition.  He argues that the victim was not injured despite her testimony
> concerning the nature of the encounter.  We disagree.
>
> Defendant did not raise this issue in his postconviction motion, and
> therefore, we need not consider it on appeal.  See People v. Lesney, 855
> P.2d 1364 (Colo. 1993); People v. Goldman, 923 P.2d 374 (Colo. App.
> 1996).  He first raised the issue in his supplemental appellate brief filed
> pro se, asserting that this issue was raised during the postconviction
> motion hearing, an assertion for which there is no support in the record.
>
> Defendant's postconviction counsel asked defendant's trial counsel
> several questions regarding introduction of expert testimony on the
> victim's condition, but failed to raise it as an issue for the Crim. P. 35(c)
> court to consider.  Therefore, we will not consider it.

People v. Crosby, 01CA0496 (Colo. App. Dec. 4, 2003); State Court Record Vol. 2 at

621-22).  As shown by the quote above, the CCA disposed of the petitioner's claim

exclusively on the state ground that he had failed to raise the claim before the trial

court in his post-conviction motion.  As demonstrated by the cases cited by the CCA in

its opinion on this claim, this procedural bar has been regularly followed and applied

evenhandedly to similar claims.  Therefore, plaintiff's third habeas claim was denied by

the CCA on an adequate and independent state ground.  See Hickman, 160 F.3d at

1271 ("A state procedural ground is independent if it relies on state law, rather than

federal law, as the basis for the decision. . . .  For the state ground to be adequate, it

must be strictly or regularly followed and applied evenhandedly to all similar claims.")
(quotations omitted).  Petitioner has thus procedurally defaulted this claim, and he is
procedurally barred from raising it in state court.

Inasmuch as the petitioner has not shown either (1) both cause for the default
and prejudice therefrom or (2) a fundamental miscarriage of justice such as a
colorable showing of factual innocence, Coleman v. Thompson, 501 U.S. 722, 749
(1991), this court is not required to review his third habeas claim on the merits.

**STANDARD OF REVIEW**

Contrary to the petitioner's assertions that the standards of the AEDPA do not
apply here because his case precedes the AEDPA (see Docket No. 13 at 11, 14), the
provisions apply to his habeas Application because it was filed after the AEDPA's
effective date.  See Lindh v. Murphy, 521 U.S. 320, 326-27 (1997); Patton v. Mullin,
425 F.3d 788, 793 (10th Cir. 2005), cert. denied, 126 S.Ct. 2327 (2006); Brown v.
Workman, 2002 WL 31372577 (10th Cir. Oct. 22, 2002).

The AEDPA "modified a federal habeas court's role in reviewing state prisoner
applications in order to prevent federal habeas 'retrials' and to ensure that state-
court convictions are given effect to the extent possible under law."  Bell v. Cone,
535 U.S. 685, 693 (2002).  "Under AEDPA, 'federal habeas review of state
convictions is limited when the state courts have adjudicated a claim on the merits.'"
Parker v. Scott, 394 F.3d 1302, 1308 (10th Cir. 2005).

More specifically, 28 U.S.C. § 2254 now provides in pertinent part:

(d) An application for a writ of habeas corpus on behalf of a person in
custody pursuant to the judgment of a State court shall not be granted

8

with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(e) (1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(d), (e)(1).  With regard to § 2254(d)(1), the U.S. Supreme Court

has stated that

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. . . .  A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. . . .  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. . . .  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams* [*v. Taylor*, 529 U.S. 362, 409-10 (2000),] that an unreasonable application is different from an incorrect one. . . . See also *id.*, at 411 . . . (a federal habeas court may not issue a writ under the unreasonable application clause "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly").

Bell v. Cone, 535 U.S. at 694.

"Avoiding these pitfalls does not require citation of [Supreme Court] cases-

9

indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002). "Furthermore, under § 2254(d)(1), the only 'federal law' [the court] consider[s] is 'clearly established federal law as determined by decisions, not dicta, of the Supreme Court.' . . . Thus, 'an absolute prerequisite for [a habeas petitioner's] claim is that the asserted constitutional right on which it rests derive in clear fashion from Supreme Court precedent.'" <u>Parker v. Scott</u>, 394 F.3d at 1308.

With the above standards in mind, this court will review the petitioner's remaining two claims for habeas corpus relief.

### Motion to Suppress

Petitioner asserts that the trial court erred in refusing to grant his motion to suppress his statement to the police because some of the statements were allegedly the result of custodial interrogation without the benefit of <u>Miranda</u> warnings and others were allegedly obtained after a purported involuntary waiver of <u>Miranda</u> rights. More specifically, in his Memorandum in Support of Petition, he asserts the following:

> Prior to trial the defense filed a motion to suppress statements made by Petitioner to police. At this hearing, officer Perez testified that he took the Petitioner back to the police station because he was dressed only in sweat pants and was unable to get back into his apartment. Perez testified that the Petitioner was not under arrest but was merely brought to the station for his convenience. While at the police station Perez asked the Petitioner about the victim and stated the Petitioner said that she had come over to his apartment to get her security deposit, that they drank some gin, had sex and then she had gotten mad an ran out of the apartment when he told her about another woman. Perez stated that although the Petitioner was free to leave, he never actually told him he could leave. The court denied the motion to suppress the statements made to Perez finding that "a reasonable person would not have anticipated arrest."; that the statements were the result of casual conversation

and not interrogation.  The court apparently puts no value on the fact that these "conversations" occurred in a police station after a woman had accused the Petitioner of sexually assualting [sic] her.  It makes no difference that Perez had not talked to the victim before he interrogated the Petitioner since Perez was at the post office and observed and heard the victim accusing the Petitioner of assaulting her.  Perez knew at the minimum that the Petitioner was a suspect in a criminal act when Perez questioned him about his version of events.  Therefore, the Petitioner's statements to Perez were the product of an un-Mirandized custodial interrogation and should have been suppressed.

Lt. Dodson was also at the post office and he spent the initial portion of the evening with the victim.  As he entered the station Perez left and Dodson sat down with the Petitioner at the table.  After observing the Petitioner's condition, he determined he would put the Petitioner in "protective custody."  He then asked the Petitioner if he could enter his apartment to conduct a search.  When Dodson asked him to sign a consent form the Petitioner stated he should talk to an attorney first.  Dodson testified that he then advised the Petitioner of his Miranda rights.  After the Petitioner signed a waiver of those rights, Dodson questioned him further.  At trial Dodson testified regarding the request to search the apartment the Petitioner's refusal and invocation of his right to counsel and the statements he made about the events of that night.

Even assuming that Perez was not engaging in the interrogation of the Petitioner at the police station and was only interested in polite conversation, the same could not be said of Dodson, who after talking with the victim before he interrogated the Petitioner, was specifically looking for probable cause to arrest the Petitioner.  Dodson did NOT immediately give the Petitioner his Miranda advisement when he first began interrogate him, but instaed [sic] asked if the police could conduct a search.  The Petitioner's refusal and request for counsel were the result of custodial interrogation and should have been suppressed.  Additionally, since the Petitioner was so intoxicated that he needed protective custody, he was not capable of engaging in a voluntary of his Miranda rights.

The officers' version of these events would seemingly be corroborated by the fact that they tape recorded the interrogation of the Petitioner, except that Dodson destroyed these statements by erasing the tapes!  Then when asked by the court for any electronically recrded [sic] material at the discovery hearing, Dodson LIED about the existence of the tapes.  He also LIED about the existence of the victim's taped statements, which he also destroyed.  The Petitioner's level of intoxication may have been better determined if not for the destroyed tapes.  What Perez failed to tell the court was that he asked the Petitioner questions about the ownership of the gun, why he and the victim were in stages of undress and why the victim was crying.  All questions asked to elicit incriminating statements from Petitioner.  We also will never know just how much the Petitioner was interrogated before Dodson Mirandized the Petitioner because of the destroyed tapes.  Administration of Miranda before statements are made does not insulate them from inquiry whether the

11

statements are voluntary. . . .  At trial Perez testified that the Petitioner was
singing incomprehensibly.  No mention of this was made in the officer's notes
and of course he never mentioned this at the suppression hearing.  The
reliability of a given witness may well be determinative or guilt or innocence,
non-disclosure of evidence falls within this rule . . . .  Because these officers
destroyed this key evidence and then lied about it to the court, the facts the
appellate court relied upon crumbles under the burden of deception.

(Docket No. 3 at vii - 3).

Petitioner asserts that he was "in custody" for the purpose of custodial

interrogation.  He contends:

while it's possible the police initially took the Petitioner to the police station out
of concern for his safety, that quickly dissapated [sic] as even Dodson admitted
that prior to putting the Petitioner into "protective custody" he was evaluating
the case for probable cause.  It was clear that the officers would never have let
the Petitioner leave as there was always an officer present with him in what
was clearly a police dominated environment and the Petitioner was never told
he could leave.  With the focus of the custody analysis being on whether the
person is deprived of freedom in any significant way, being placed in
"protective custody," and told you will not be able to leave is certainly a
deprivation of freedom constituting custody.  Therefore these statements
should have been suppressed at trial and the Petitioner's testimony at trial
should be suppressed at any future proceeding, unless he decides to testify, as
Petitioner felt forced to testify at trial to rebut the statement made by Dodson
and Perez in violation of his Fifth Amendment rights.

(Docket No. 3 at 5).

Petitioner further asserts that the CCA's finding that his post-Miranda

statements were admissible because he voluntarily waived his Miranda rights is not

supported by the record.  More specifically, he contends that

the evidence shows that at 2:30 a.m., hours after the Petitioner had waived his
Miranda rights, he had a blood alcohol content of .193.  It was projected by
police at the time of his arrest his BAC was probably .243.  Dodson testified
that the Petitioner's eyes were bloodshot, he was unbalanced, and his speech,
while clear, was slow.  Also, let's remember Perez's testimony at trial where he
stated that the Petitioner was singing incomprehensibly.  Further, he was
purportedly so intoxicated that Dodson discerned that it was necessary to put
him into "protective custody" and not let him leave the police station because
he was afraid that he "would not exercise good judgement."  The appellate
court's finding was that the Petitioner was so intoxicated that he could not be

allowed to simply walk out of the police station but could exercise knowing and intelligent judgement in the serious decision to waive his Miranda rights; it's an oxymoron and they can't have it both ways.

Further support for this comes from the Petitioner's request for an attorney.  At this point ALL questioning should have stopped. . . .

A review of the totality of the circumstances, especially in light of the fact that police destroyed material tape recordings of the event and then lied about it to the court, demonstrates that the Petitioner's waiver of his Miranda rights was not voluntary.  Therefore, the court erred by not suppressing these statements.  This was clearly a violation of the Petitioner's Fifth Amendment rights and his conviction should be overturned.  The appellate court ruled that an in camera hearing discovered all of the statements contained in the officer's report (appellate court decision, attachment 1, p.8).  The court was in egregious error as verbatim transcriptions of the tapes would have produced anywhere from 15 to 30 pages of statements.  Dodson disclosed 2½ (approx. 1½ pages from the Petitioner and 1 page from the victim's) tape recorded statements.  The appellate court held that even if the inculpatory statements were obtained in violation of Miranda, it was harmless error due to the overwhelming evidence of the Petitioner's guilt.(appellate court decision, attachment 1, p.6).  It is clear from the post-trial questionaire [sic] returned by the jury that nothing could be further from the facts in this case. . . .

(Docket No. 3 at 6-8).

After a hearing, the trial court made the following findings with respect to the

petitioner's motion to suppress:

Defendant's statements were made in five circumstances.

First, he gave information when officers responded to the Avon Post Office upon dispatch at about 10:52 p.m.  He was not advised of his rights and officers noted evidence of intoxication.  He was scantily clothed.

The initial contact and summary inquiry by Officer Gress were legitimate responses to the 911 call for help.  Offer Perez continued that inquiry when he arrived by asking "What's going on."  Defendant gave a pretty detailed response.  No custodial interrogation occurred.

x x x

No statements of substance were apparently made during the period after Defendant left the post office with Mr. Perez at Defendant's request to get properly clothed.  They tried to reenter the apartment.  After that failed because Defendant had no keys, Perez asked if he'd voluntarily go to the police station

13

and Defendant agreed.  They drove to the station, Defendant in back behind a screen and with locked doors.  Perez had not arrested Defendant but tagged along with him.

x x x

At the station, Defendant made some statements to Perez about Ms. Bacon.  At this stage, from the point of view of Perez, Defendant was being provided warmth and shelter pending securing entry to his apartment.  He was still shirtless and shoeless.  This stage lasted from about 11:00 p.m. until Perez left at about 12:30.  Officer Perez characterized this stage of the proceedings as involving chatter rather than investigation.  Defendant was characterized as very cooperative.  He was trying to get his story out.  Officer Perez did not know what information Gress had obtained from Ms. Bacon, who he interviewed.  The door to the patrol room was open and Perez felt defendant could have left though it was very cold outside.  Perez did inquire of Defendant for voluntary consent to search the apartment.  Defendant did not consent and said he thought he ought to see an attorney.  At this stage, Perez left.

The preponderance of the evidence is that no custodial interrogation occurred until this point.  Perez did not have the information other officers had obtained from Ms. Bacon.  Defendant had been with Perez throughout and knew that he knew only what Defendant had said.  A reasonable person in Defendant's position would not have anticipated arrest.  Humanitarian concerns for Defendant's inability to enter his apartment and inadequate clothing motivated his hanging around the station.

x x x

The fourth stage of the investigation began about when Perez left and when Defendant expressed a desire to consult an attorney before consenting to search.  Sergeant Dodson had been with Defendant and Perez at the police station for a good portion of the time they were there.  He had assisted in efforts to secure Defendant's entry to his apartment but had stayed largely in the background until about the time Perez left.

Officer Dodson was the principal investigator of the case.  He had responded to the post office.  He heard some of the statements made by Ms. Bacon to Gress.  He arrived at the police station after Defendant and Perez.  It was his view that Defendant would not be permitted to leave until the effects of intoxication wore off, although he was quite coherent.  Dodson felt he had probable cause to arrest well before Perez left.  At about the time Perez left, Defendant said he thought he ought to see and attorney before granting permission to search the apartment.

At about 12:37, Dodson told Defendant he was a suspect as to sexual assault.  He advised Defendant of his rights to silence, to an attorney and to free legal assistance.  Defendant then gave a detailed account and consent to

14

search the apartment.  Dodson inquired extensively.  After Defendant was placed in a holding cell he gave consent to biological sampling and testing.

x x x

Perez returned and the fifth stage of the investigation commenced when he took Defendant to the hospital for tests.  Defendant made some statements during this process.  The People confess suppression as to these statements denying suicide ideation.

x x x

At the end of the third stage and at the onset of the fourth stage, after Defendant's remark that he wanted to see an attorney regarding the search and after Dodson became active but before the formal advisal, it is unclear what statements were made.  If there were any they were made in a custodial situation and if elicited by questions of the officers should be suppressed.

Ordinarily, of course interrogation must cease when an attorney is requested.  The evidence here is clear that defendant did not request an attorney generally.  He was only concerned with legal advice as to the request for a search.  Office [sic] Dodson properly responded to these issues and advised Defendant formally.  Defendant knowingly and voluntarily waived his rights to counsel and to silence.  No search was apparently made until after issuance of a warrant therefor.

The court therefore concludes that it would be improper to suppress statements made after the advisal even though advisal was preceded by a suggestion of a desire for counsel as to consent to search.

(Vol. 1, pp. 78-80).

The CCA found the following with regard to petitioner's suppression

arguments:

In support of his contention that all of his statements should have been suppressed, defendant first argues that the trial court erred by concluding that he was not in custody when he was at the police station with the first officer.  Specifically, defendant maintains that the trial court applied an incorrect legal standard and failed to consider the first officer's knowledge that the victim had accused defendant of sexual assault and kidnapping.  In addition, defendant contends that the trial court ignored the fact that, when speaking to that officer, he was so underdressed for the weather that he was effectively prevented from leaving the police station.  We conclude that the trial court applied the appropriate standard and that the court's findings are sufficiently supported by the record.

The determination of whether a person is in custody so as to trigger the requirement for a Miranda advisement turns on an objective assessment of whether a reasonable person in the suspect's position would believe himself or herself to be deprived of freedom of action in any significant way.  People v. Viduya, 703 P.2d 1281 (Colo. 1985); see also People v. Wallace, 724 P.2d 670 (Colo. 1986).  The existence of custody is "not limited to those situations involving a formal arrest."  People v. Horn, 790 P.2d 816, 818 (Colo. 1990).

Factors to consider in determining whether a person is in custody include: the time, place, and purpose of the encounter; the persons present during the interrogation; the words spoken by the officer to the defendant; the officer's tone of voice and demeanor; the length and mood of the interrogation; whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; the officer's response to any questions by the defendant; whether directions were given to the defendant during the interrogation; and the defendant's verbal or nonverbal response to such directions.  People v. Viduya, supra.  "[T]he fact that an interview takes place at a police station . . . is not determinative of the custody issue."  People v. Horn, supra, 790 P.2d at 818.

The determination of whether an individual is "in custody" is a question of fact which must be resolved by the trial court.  People v. Johnson, 671 P.2d 958 (Colo. 1983).  The court's findings of fact will not be reversed upon appeal when they are supported by competent evidence in the record.  People v. Trujillo, 784 P.2d 788 (Colo. 1990).

Here, the trial court found that defendant was not in custody until he stated that he wanted to see an attorney regarding the request to search his apartment.  Accordingly, the trial court did not suppress any statements made by the defendant, except during the period between when he requested to speak with an attorney and his Miranda advisement.

The trial court found that defendant was not in custody then because the first officer did not know defendant was a suspect in the sexual assaults and defendant was at the police station only because he did not have access to his apartment and the officer had offered him shelter there.

Defendant contends that the trial court employed the wrong standard for determining whether defendant was in custody because the court focused on whether a reasonable person in defendant's position would have believed that arrest was imminent.  We are not persuaded.

While the trial court did not explicitly set forth the appropriate "freedom of action" test set forth above, it is evident from the record that the court applied the appropriate legal standard.  See People v. Mack, 895 P.2d 530 (Colo. 1995) (although trial court phrased test for custody as whether defendant was "free to leave," the court's description of the controlling standard did not affect its assessment of the relevant evidence).

16

Significantly, defendant has not alleged that his initial decision to travel to the police station was in any way coerced by the police officers. And, clearly, a reasonable person electing to travel to the police station when partially clothed would be aware that, once there, it would be impractical to depart without clothing suitable for the cold weather. Cf. People v. Vese, 100 Misc. 2d 8, 417 N.Y.S.2d 1015 (N.Y. Sup. Ct. 1979) (under circumstances in which it was bitterly cold and defendant's apartment had just suffered a fire, questioning of defendant in police car was not custodial interrogation).

Defendant's final claim on this point is that the trial court erred by not suppressing his statement denying consent to search his apartment and requesting counsel to assist him in making a decision whether to consent to such a search. However, even if we were to assume that admission of his testimony was error, it was rendered harmless beyond a reasonable doubt by the overwhelming evidence of defendant's guilt. See People v. Wilson, 709 P.2d 29 (Colo. App. 1985) (inculpatory statement obtained in violation of Miranda was harmless error due to abundant evidence of defendant's guilt).

. . .

Defendant next argues that the trial court erred in concluding that the prosecution had proven by a preponderance of the evidence that he voluntarily waived his Miranda rights. We conclude the trial court's findings are supported by the record.

Once advised of his or her privilege against self-incrimination and the right to counsel, a defendant may be subjected to custodial interrogation only if he or she thereafter voluntarily, knowingly, and intelligently waives those rights, and the prosecution has the burden of proving such waiver by a preponderance of the evidence. People v. May, 859 P.2d 879 (Colo. 1993).

The validity of a waiver is determined in part by whether it was made with a full awareness, both of the nature of the right being abandoned and the consequences of the decision to abandon it. People v. May, supra.

Defendant maintains that he was so intoxicated at the time that he acknowledged and signed the Miranda advisement and waiver form that his waiver was not voluntary. We are not persuaded.

Although the trial court concluded defendant knowingly and voluntarily waived his rights, it did not make specific findings regarding defendant's level of intoxication. However, the evidence in the record supports the trial court's implicit determination that defendant was not so intoxicated that he was unable to comprehend the nature of his rights or the consequences of abandoning them. See Smith v. State, 639 So. 2d 543 (Ala. Crim. App. 1993) (extremely high blood-alcohol level insufficient to demonstrate that Miranda waiver was involuntary).

People v. Crosby, 94CA1939 (Colo. App. Sept. 5, 1996); State Court Record Vol. 2 at 330-34.

"The Fifth Amendment to the United States Constitution guarantees that no person can be compelled to testify against him or herself in a criminal case. . . .  A confession or admission made during custodial interrogation, but in the absence of legal counsel, can be admitted against a criminal defendant only if the defendant has waived his constitutional rights."  Abeyta v. Estep, 2006 WL 1061955, *5 (D. Colo. Apr. 20, 2006) (citations omitted), certificate of appealability denied, 198 Fed. Appx. 724 (10th Cir. Oct. 4, 2006), cert. denied, 126 S.Ct. 1006 (2007).  "In order to be effective, a waiver must be made 'voluntarily, knowingly, and intelligently.'"  Smith v. Mullin, 379 F.3d 919, 932 (10th Cir. 2004) (quoting Miranda v. Arizona, 384 U.S. 436, 444 (1966)).  "The Supreme Court has held that a court's inquiry into a waiver's validity 'has two distinct dimensions,'" namely:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

Id. at 932-33 (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)).

In this case, as noted above, the trial court found by a preponderance of the evidence that no custodial interrogation occurred until the petitioner responded to Officer Perez's inquiry regarding voluntary consent to search the apartment; petitioner did not consent and said he thought he ought to see an attorney.  The trial court found

18

that at that time, Officer Perez did not have the information other officers had obtained from the victim, that the petitioner had been with Officer Perez throughout, and that Officer Perez knew only what the petitioner had said.  Moreover, the trial court found that a reasonable person in the petitioner's position would not have anticipated arrest and that humanitarian concerns for the petitioner's inability to enter his apartment and inadequate clothing motivated his hanging around the station.  In addition, the trial court found that the petitioner knowingly and voluntarily waived his rights to counsel and to silence.

With respect to the petitioner's argument that the trial court erred by concluding that he was not in custody when he was at the police station with Officer Perez, the CCA found that the trial court applied the appropriate standard and that the court's findings are sufficiently supported by the record.  The court stated, "Significantly, defendant has not alleged that his initial decision to travel to the police station was in any way coerced by the police officers.  And, clearly, a reasonable person electing to travel to the police station when partially clothed would be aware that, once there, it would be impractical to depart without clothing suitable for the cold weather."

In addition, the CCA was not persuaded by the petitioner's argument that he was so intoxicated at the time that he acknowledged and signed the Miranda advisement and waiver form that his waiver was not voluntary.  The court found that the evidence in the record supported the trial court's implicit determination that defendant was not so intoxicated that he was unable to comprehend the nature of his rights or the consequences of abandoning them.

19

Upon careful review of these rulings and the record, this court finds that the state court's decisions above did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States and did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  The record supports the findings that the petitioner was partially clothed on a very cold evening, he agreed to accompany the police officer to the police station, the patrol room door was left open, and petitioner was cooperative during the initial conversation in an effort "to get his story out."  While there was evidence that petitioner was intoxicated, the officers testified that the petitioner was responsive, seemed to understand questions and responded to them intelligently (State Court Record Vol. 3 at 36, lines 1-5, 38 at lines 4-5), his speech was slow but clear, and he "was quite coherent" (State Court Record Vol. 3 at 52, lines 9-10, 21).   In sum, habeas relief is not warranted on this claim.

**Destruction of Tape Recorded Statements Made by the Petitioner and the Victim**

Petitioner next contends that the trial court erred when it refused to grant his motion to dismiss or his motion for a mistrial which were based upon the destruction by the police of tape-recorded statements made by the petitioner and the victim.  He asserts that the evidence was lost by state action, that it possessed an exculpatory value that was apparent before the evidence was lost or destroyed, that he was unable to obtain comparable evidence by reasonably-available means, and that it was a

20

discovery violation.  More specifically, petitioner asserts:

> After Dodson interviewed the Petitioner at the police station, he prepared a report purporting to be a comprehensive summary of every relevant statement made by the Petitioner during the interrogation.  However, at trial it became obvious that there were many statements allegedly made by the Petitioner that were not included in Dodson's report.  For example, Dodson testified but did not include in his report that the Petitioner told him that he and the victim had engaged in oral sex that evening.  Dodson testified but did not include in his report that the Petitioner stated that BOTH he and the victim were smoking cigarettes that night, a claim the Petitioner vehemently denied; he testified that only HE smoked that night.  It is noteworthy that no nicotine was present in the victims [sic] blood.  (see attachment 7, p.3).  Dodson testified but did not include in his report that the Petitioner stated he went after the victim when she left his apartment because he was worried about her being dressed in his robe and carrying a gun.  There were several other statements as well.  At the in camera hearing, the district attorney confessed there was an order by the trial court for discovery of all oral statements made by the Petitioner.  In addition to his "new" statements given on the stand, Dodson confessed few others.  However, a verbatim transcript of both the Petitioner's and the victim's statements would have produced anywhere from 15 to 30 pages of statements.

> The defense argued that a mistrial was warranted because these were allegedly the statements of the Petitioner and hence very important to the defense, that they corroborated the victim's testimony, that the jury had already heard the statements so the damage was done, that had they been disclosed earlier the defense could have challenged the, and, finally, that the cross-examination of other witnesses and voir dire may have been different. . . .

> . . .

> Here Dodson testified that the tapes were collected in the performance of routine procedures.  It is no surprise that he could give no good reason why they were not preserved; he stated he did not have to preserve tapes unless they were in the nature of a confession and that the tapes (two micro-cassettes) would be a "storage problem."  Therefore it is clear that the state destroyed the evidence by intentional state action.

> . . .

> Dodson, an experienced police officer as evidenced by his rank of Lieutenant, had to know that often times sexual assault cases hinge on credibility determinations and consequently he knew of the importance of impeachment material in these cases.  Having interviewed both the Petitioner and the victim, he knew that the alleged sexual assault took place at the Petitioner's apartment with no witnesses.  At the time he interrogated the Petitioner he was trying to figure out probable cause (and arrested him at that time), considered him a suspect in a sexual assault, and had already placed him in "protective custody."

21

Therefore, when Dodson made the tapes (when he taped the victim's statements he had **already arrested** the Petitioner), he knew there were criminal charges being brought against the Petitioner and also knew the importance of these statements for corroborative and impeachment value. That Dodson acted in bad faith is beyond refutation; what could possibly be a more powerful piece of evidence for the prosecution then [sic] to be able to play a recording to the jury of a victim's recital of how she was sexually assaulted? The only conclusion a reasonable person could reach is that there was material on those tapes that could hurt the prosecutions [sic] case or bolster the defense's case. There could be no other motive. . . .

. . .

This case hinged on the credibility of the Petitioner and the victim as both testified and both gave dramatically different versions of the evening. By not having these tapes, the Petitioner was denied the opportunity to fully litigate the voluntariness of his statements in the suppression hearing, was denied the opportunity to have his testimony at trial supported by his statements on the night of the incident, was denied the opportunity to have his demeanor and intoxication level, as reflected by his own statements and voice, considered by the jury to explain some of his actions that night, was denied the opportunity to impeach the victim with her own words in her own voice, and was denied the opportunity to fully impeach Dodson at trial with the descrepancies [sic] between his typed report, his memory of what was said by the Petitioner and the victim, and his testimony at trial. <u>There was no other evidence that would have the same impact as the parties [sic] verbatim statement made in their own voices.</u> . . .

The trial court's sanction for the destroyed statements was to dismiss the alleging [sic] oral sex. This sanction was impotent as a pretrial agreement resulted in any convictions for sexual assault being run concurrently. This was no sanction for the prosecution who entered into this agreement after knowingly sending the blood samples to be tested at a lab they knew had been decertified almost a year before. The intent was to get the decertified lab to use up the samples and thereby prevent them from being tested at a certified laboratory. It is no coincidence that the results opposed the victim's allegations regarding being forced to smoke cigarettes at gunpoint. . . . Affording the defense the "opportunity" to a broad cross-examination of Dodson, something already allowed in normal procedure, was a nothing sanction. Since the Petitioner was extremely intoxicated and the victim constantly made inconsistent statements, the only other testimony that was available as to what actually was said that night by the parties <u>came from the person responsible for the destruction of the tapes.</u> As demonstrated by Dodson's own testimony, and his lie to the court about the existence of the tapes, he was not a credible source of what was said and done that night.

(Docket No. 3 at 10-16). Petitioner claims that the destruction of the tapes deprived him

22

of due process of law under the Fourteenth Amendment and his Sixth Amendment right

to confrontation.

The CCA found the following with respect to the destruction of these tapes:

> Defendant also contends that the trial court abused its discretion in not granting his motion for a mistrial as a remedy for a discovery violation. We perceive no abuse of discretion.

> Prior to trial, defendant filed a motion for discovery of all oral statements made either by him or any witness contacted during the investigation, whether tape-recorded or reduced to writing. The prosecution confessed the motion.

> During the trial, it became apparent that defendant and the victim had made numerous statements to the investigating officer which he had not included in his reports summarizing the interviews. The officer failed to disclose that, after waiving his Miranda rights, defendant had told the officer: (1) that he and the victim had engaged in oral sex; (2) that he and the victim had both been smoking cigarettes; (3) that he had followed the victim into the common area of the building because she had taken the handgun and he was concerned about her; and (4) that he had asked the victim to come to his apartment in order to help him pack. After conducting an in camera cross-examination to discover all statements not contained in the officer's report, defendant moved for a mistrial.

> The trial court denied defendant's motion for a mistrial, ruling that defendant could conduct broad cross-examination in order to demonstrate to the jury that the investigating officer had withheld certain statements. The court reasoned that the statements not included in the report related to matters which were not so prejudicial to defendant as to warrant a mistrial.

> The imposition of sanctions for failure to comply with criminal discovery rules is within the sound discretion of the trial court. Crim. P. 16(III)(g); People v. Thurman, 787 P.2d 646 (Colo. 1990). Absent a cogent demonstration of prejudice to a defendant, a conviction will not be reversed solely because of noncompliance with discovery rules. Salazar v. People, 870 P.2d 1215 (Colo. 1994); People v. Graham, 678 P.2d 1043 (Colo. App. 1983), cert. denied, 467 U.S. 1216 . . . . (1984).

> A "mistrial is a drastic remedy and is warranted only when the prejudice to the defendant is too substantial to be remedied by other means. . . . Moreover, the trial court has broad discretion in determining whether mistrial is required, and its determination may be reversed only for gross abuse of discretion and prejudice to the defendant." People v. Gillis, 883 P.2d 554, 561 (Colo. App. 1994) (citation omitted).

> Inasmuch as the trial court allowed defendant wide-ranging cross-

23

examination of the investigating officer to minimize any prejudice, we perceive no abuse of discretion in its refusal to order a mistrial.

. . .

In a related claim, defendant asserts that the trial court erred by not granting his motion seeking dismissal of all charges or a mistrial once the investigating officer revealed that he had failed to preserve tape-recorded interviews he had conducted with defendant and the victim.  We disagree.

On re-direct examination, the officer revealed that his interviews with defendant and the victim had been tape-recorded.  In an *in camera* hearing, the investigating officer explained that he had used the tape recordings to prepare his written reports and then erased the tapes in order to reuse them.  The officer confirmed that he had never mentioned the existence of the tapes to anyone in the district attorney's office.

On the basis of the officer's testimony, defendant moved for dismissal of all charges or a mistrial as a remedy for the loss of evidence and asserted discovery violation.  The trial court granted defendant's motion in part, dismissing the sexual assault charge which alleged that defendant had forced the victim to engage in oral sex.  The trial court reasoned that the only material evidence contained in the tape recording which was not available to defendant by means of the officer's report was the defendant's statement to the officer describing consensual oral sex with the victim.  The trial court concluded that, with the dismissal of this charge, the prejudice to defendant was insufficient to warrant a mistrial.  However, the court directed that defense counsel could interview the victim prior to resuming cross-examination of the investigating officer and, if defendant wished, could recall the victim to testify further.

The constitutional duty imposed upon the state to preserve evidence is limited to that evidence that is constitutionally material.  For evidence to be constitutionally material, the evidence (1) must have an exculpatory value that was apparent before the evidence was lost or destroyed; and (2) the defendant must be unable to obtain comparable evidence through other available means.  People v. Wyman, 788 P.2d 1278 (Colo. 1990).

Here, defendant maintains that the destroyed tape recordings had exculpatory value because the impeachment of a victim's account of a sexual assault and corroboration of a defendant's denial are always relevant in a sexual assault prosecution.  As the trial court correctly recognized, defendant's general claim of potential exculpatory value is constitutionally insufficient.  See Banks v. People, 696 P.2d 293 (Colo. 1985); see also State v. Morales, 844 S.W.2d 885 (Tex. App. 1992) (because defendant's tape-recorded interview contained inadmissible, self-serving hearsay, it did not have exculpatory value such that police conduct of erasing and reusing the tape amounted to a due process violation).

24

> Although the failure to preserve the tape-recorded interviews did not amount to a due process violation, the investigating officer's failure to disclose that the tape-recordings had been made and erased was clearly such a violation. However, because any prejudice to defendant was cured by the court's remedial orders, we reject defendant's claim that the court abused its discretion in not declaring a mistrial.

People v. Crosby, 94CA1939 (Colo. App. Sept. 5, 1996); State Court Record Vol. 2 at 326-30.

"The duties to disclose and preserve impeachment/exculpatory evidence are grounded in the due process right to a *fair trial*." Morgan v. Gertz, 166 F.3d 1307, 1310 (10th Cir. 1999) (citing Kyles v. Whitley, 514 U.S. 419, 434 (1995); United States v. Bagley, 473 U.S. 667, 678 (1985); United States v. Agurs, 427 U.S. 97, 104 (1976); Brady v. Maryland, 373 U.S. 83, 87 (1963)).  "Under Youngblood [Arizona v. Youngblood, 488 U.S. 51 (1988)], a defendant can establish a due process violation if he can show that (1) the government failed to preserve evidence that was 'potentially useful' to the defense; and (2) the government acted in bad faith in failing to preserve the evidence." Riggs v. Williams, 87 Fed.Appx. 103, 106 (10th Cir. Jan. 21, 2004) (citing Youngblood, 488 U.S. at 58), cert. denied, 541 U.S. 1090 (2004).  See California v. Trombetta, 467 U.S. 479 (1984); Snow v. Sirmons, 474 F.3d 693, 716 (10th Cir. 2007) ("Supreme Court authority makes clear that when dealing with lost or destroyed evidence, 'unless a criminal defendant can show bad faith on the part of the police, failure to preserve *potentially useful* evidence does not constitute a denial of due process of law.").  "[T]he inquiry into bad faith 'must necessarily turn on the police's knowledge of the exculpatory value of the evidence." Riggs v. Williams, 87 Fed.Appx. at 106  (citing Youngblood, 488 U.S. at 57 n. *).  However, the "mere fact that the

25

government controlled the evidence and failed to preserve it is by itself insufficient to

establish bad faith." Id. (quoting United States v. Bohl, 25 F.3d 904, 910 (10th Cir.

1994)).  "This is true even if the government acted negligently . . . or even intentionally,

so long as it did not act in bad faith." Id.  "The issue of bad faith under *Youngblood* is a

mixed question of law and fact in which the quintessential factual question of intent

predominates . . . ." Id.  Therefore, this court must determine whether the facts are

correct and whether the law was properly applied to the facts.  See 28 U.S.C. §

2254(d)(1) and (2).

Here, this court finds that the state court's conclusions regarding the tape

recordings did not result in a decision that was contrary to, or involved an

unreasonable application of, clearly established federal law, and did not result in an

unreasonable determination of the facts presented in the state court proceeding.

The evidence supports the trial court's finding that neither the prosecutor nor the officer

acted in bad faith with respect to the erasure of the tape recordings of the officer's

interviews of the petitioner and the victim.  The court stated:

> The Court simply would not find any fault on the part of the district
> attorney other than maybe administratively not becoming aware of the
> police procedures, and I thought that he was credible and good faith in
> being surprised that a tape had been made and destroyed.  The officer
> appears to have been in good faith in strictly following the employee
> procedures, evidenced by exhibit A.[1]  There's some question about that
> because of the exceptions in the — in paragraph 30, or .30, which says
> "confessions or other similar type information," but I'm not convinced by
> the variances between his testimony and what's in his reports that there's

---

[1]As noted by the CCA, in an *in camera* hearing, the investigating officer
explained that he had used the tape recordings to prepare his written reports and then
erased the tapes in order to reuse them.

26

> any real violation of destroyed – real violation by having destroyed,
> particularly exculpatory information. . . .

(State court records, Vol. 5 at 32, line 15, to 33, line 2).   This ruling is not an

unreasonable application of clearly established federal law, which is set

forth above.

Petitioner also asserts that there was a discovery violation.   "Brady [v. Maryland,

373 U.S. 83 (1963)] provides that the State's suppression of 'evidence favorable to an

accused . . . violates due process where the evidence is material either to guilt or to

punishment.' . . .   This is so irrespective of the prosecution's good or bad faith."

Knighton v. Mullin, 293 F.3d 1165, 1172 (10th Cir. 2002), cert. denied, 538 U.S. 930

(2003).   "In the usual case, a [petitioner] seeking habeas relief for an alleged Brady

violation 'must show that: (1) the prosecution suppressed evidence; (2) the evidence

was favorable to the accused; and (3) the evidence was material to the defense.'"

Trammell v. McKune, – F.3d –, 2007 WL 1087329 (10th Cir. Apr. 12, 2007) (quoting

Snow v. Sirmons, 474 F.3d 693, 711 (10th Cir. 2007)).

The court agrees with the respondents, however, that the issue here is not

whether the prosecution failed to disclose exculpatory evidence.   The officer used the

tape recordings to prepare his written reports, which were disclosed to the petitioner.

Therefore, the substance of the tape-recorded statements were disclosed to the

petitioner by the prosecution.   See Morgan v. Gertz, 166 F.3d 1307, 1309 (10th Cir.

1999) (Duty to preserve under Arizona v. Youngblood, not duty to disclose under Brady,

was implicated in the state court proceedings when the state provided the defendant

with a written summary of a tape-recorded interview that had been taped over by the

27

interviewer.).[2]

Based upon the discussion and findings above, this court finds that there is no basis upon which to grant the Application on the basis of this claim.

## CONCLUSION

In sum, based upon a thorough, independent review of the record and the relevant federal law, this court finds that the state court's conclusions did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, nor did it result in an unreasonable determination of the facts presented in the state court proceeding.

**WHEREFORE,** for the foregoing reasons, it is hereby

**RECOMMENDED** that the Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 by a Person in State Custody (Docket No. 2), as amended (Docket Nos. 9 and 11), be **DENIED** and **DISMISSED WITH PREJUDICE**.

**NOTICE:  Pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), the parties have ten (10) days after service of this recommendation to serve and file written, specific objections to the above recommendation with the District Judge**

---

[2]In any event, as noted by the CCA, the trial court reasoned that the only material evidence contained in the tape recording which was not available to the petitioner by means of the officer's report was the petitioner's statement to the officer describing consensual oral sex with the victim.  The trial court concluded that, with the dismissal of this charge, the prejudice to the petitioner was insufficient to warrant a mistrial.  However, the court directed that defense counsel could interview the victim prior to resuming cross-examination of the investigating officer and, if petitioner wished, could recall the victim to testify further.  The CCA found that "because any prejudice to defendant was cured by the court's remedial orders, we reject defendant's claim that the court abused its discretion in not declaring a mistrial."

assigned to the case.  The District Judge need not consider frivolous, conclusive, or general objections.  A party's failure to file and serve such written, specific objections waives *de novo* review of the recommendation by the District Judge, Fed. R. Civ. P. 72(b), <u>Thomas v. Arn</u>, 474 U.S. 140, 148-53 (1985), and also waives appellate review of both factual and legal questions.  <u>Makin v. Colorado Dep't of Corrections</u>, 183 F.3d 1205, 1210 (10th Cir. 1999); <u>Talley v. Hesse</u>, 91 F.3d 1411, 1412-13 (10th Cir. 1996).

Dated:      June 4, 2007               <u>s/ Michael J. Watanabe          </u>
            Denver, Colorado           Michael J. Watanabe
                                       United States Magistrate Judge